**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA | ) | 1:16 CR 463-17 |
| | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| MIGUEL DENAVA | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

A jury convicted Miguel Denava of conspiracy to engage in racketeering activity and committing a violent crime in aid of racketeering. *See* 18 U.S.C. §§ 1959(a)(2)–(3); *id.* 1962(d). Denava moves for judgment of acquittal on the grounds that the evidence presented at trial was insufficient to sustain the verdicts on both counts or, in the alternative, for a new trial because the Court erred in denying his motions for severance; in denying him from calling a key witness; in admitting hearsay evidence; allowing an improper comment by a juror on the first day of trial; making improper comments as to the other individuals indicted; and admitting evidence pertaining to other violent incidents. (*See generally* Dkt. 1785).[1] For the following reasons, the motion is denied. (*Id.*)

---

[1] Denava's first attorney makes several other arguments for purposes of preservation that this Court already ruled on and will not address again: denying four of his proposed jury instructions, excluding the matter raised in a sealed filing, and denying the motion to bar evidence of the use of ALKN dues. (*See generally* Dkt. 1785). Denava's second attorney also filed a posttrial motion—but it is untimely. *See* Fed. R. Crim. P. 45(b). This Court entered multiple orders asking whether new counsel wished to file any posttrial motions, and the deadlines were either missed or ignored. (*E.g.*, dkt. 2451). The ultimate filing came over two years after the jury returned the verdict, *see* Fed. R. Crim. P. 29 (setting a fourteen-day deadline for acquittal motions), and three weeks after the Court set a hard cutoff. (Dkt. 2612). No "excusable neglect" justifies the late filing, and so, it will not be considered, (Dkt. 2644). *See, e.g.*, *Eberhart v. United States*, 546 U.S. 12, 17 (2005) (*per curiam*) ("[D]istrict courts must observe the clear limits of the Rules of Criminal Procedure when they are properly invoked."); *Carlisle v. United States*, 517 U.S. 416, 420 (1996) ("There is simply no room in the text of [the criminal rules] for the granting of an untimely postverdict motion for judgment of acquittal, regardless of whether the motion is accompanied by a claim of legal innocence, is filed before sentencing, or was filed late because of attorney error."). Denava, himself, submitted a brief with additional issues, but a defendant "does not have a right to represent himself when he is also represented by counsel." *United States v. Cross*, 962 F.3d

## DISCUSSION

### A.     Motion for Acquittal

"A jury verdict will only be overturned 'if, after viewing the facts in the light most favorable to the government, there was insufficient evidence to convict.'" *United States v. Perryman*, 20 F.4th 1127, 1133 (7th Cir. 2021) (quoting *United States v. Jett*, 908 F.3d 252, 273 (7th Cir. 2018)); *see also* Fed. R. Crim. P. 29. This is no easy feat. *See id.* ("We have described this challenge for the defendant as an uphill battle, a momentous task, a heavy burden, and a nearly insurmountable hurdle …" (cleaned up)). The defendant bears the burden of establishing that *no reasonable jury* could find him guilty beyond a reasonable doubt. *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009)) (emphasis added). "Such a challenge leads to a reversal only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010) (cleaned up). Denava has not cleared the "nearly insurmountable hurdle" for either count. *Jett*, 908 F.3d at 273.

### A.     Racketeering Conspiracy (Count I)

The Racketeer Influenced and Corrupt Organizations Act ("RICO") exists "to eradicate organized crime by 'bring[ing] the often highly diversified acts of a single organized crime enterprise under RICO's umbrella.'" *United States v. Irizarry*, 341 F.3d 273, 293 n.7 (3d Cir. 2003) (quoting *United States v. Eufrasio*, 935 F.3d 553, 566 (3d Cir. 1991)). To that end, the law imposes criminal and civil liability upon those who engage or conspire to engage in certain "prohibited activities," defined as "racketeering activity" or the "collection of an unlawful debt." *H.J. Inc. v. Nw. Bell Telephone Co.*, 492 U.S. 229, 232 (1989); *see also* 18 U.S.C. § 1962. A RICO conspiracy has three elements: (1) an agreement to conduct or participate in the affairs (2) of an enterprise (3)

---

892, 899 (7th Cir. 2020); *see also United States v. Williams*, 495 F.3d 810, 813 (7th Cir. 2007). This Court exercises its "wide discretion" in rejecting Denava's *pro se* submission. *Cross*, 962 F.3d at 899.

through a pattern of racketeering activity.'" *United States v. Brown*, 973 F.3d 667, 682 (7th Cir. 2020) (quoting *United States v. Olson*, 450 F.3d 655, 664 (7th Cir. 2006)); *see also Salinas v. United States*, 522 U.S. 52, 61–66 (1997); 18 U.S.C. § 1962(d). Viewed in the light most favorable to the government, a reasonable jury could conclude that Denava agreed to engage in the affairs of an enterprise, the Latin Kings, through racketeering activity.

### i.  Agreement & Enterprise

An enterprise is "any individual partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The phrase "any union or group of individuals associated in fact" means a group "associated together for a common purpose of engaging in a course of conduct." *United States v. Volpendesto*, 746 F.3d 273, 284 (7th Cir. 2014) (quoting *Boyle v. United States*, 556 U.S. 938, 944 (2009)). This definition is broad. *See United States v. Brown*, 973 F.3d 667, 682 (7th Cir. 2020) ("The Supreme Court reads [§ 1961(4)] broadly."); *see also Boyle*, 556 U.S. at 944 ("This enumeration of included enterprises is obviously broad …."); *United States v. Bergrin*, 650 F.3d 257, 267–68 (3d Cir. 2011) ("[T]he Court has repeatedly pointed to RICO's legislative history and § 904(a) of the Organized Crime Control Act of 1970 as evidence that Congress intended to create a broad and powerful new statutory weapon …."). All that is required is "evidence of an ongoing organization, formal or informal, and … evidence that the various associates function as a continuing unit." *Kaye v. D'Amato*, 357 F. App'x 706, 711 (7th Cir. 2009) (quoting *Boyle*, 556 U.S. at 945)). That requirement was more than met.

The testimony of several Latin King members—Fernando Chavez, Alexander Vargas, and Paulino Salazar—described the nature of their "enterprise." The Latin Kings was—and still is—a national gang divided geographically into regions, which, in turn, were further divided into

chapters. (Chavez Tr. 267–68; Vargas Tr. 1223–25). Regions had leadership structure. The Regional Inca led the region; the Regional Enforcer enforced discipline and adherence to rules and by-laws; and the Regional Treasurer collected dues from the region's chapters. (Chavez Tr. 261). Dues collected from members were used for guns and—when members were arrested or charged with gang-related crimes—for bail and legal services. (Chavez Tr. 261, 267–68; Vargas Tr. 1256–57). Young men seeking to join the group had to endure a recruiting process, during which they proved themselves by carrying firearms, patrolling the neighborhood, committing acts of violence, and participating in other gang activity. (Chavez Tr. 224–25; Salazar Tr. 921, 924–26). Once accepted, these recruits became "soldiers" in each chapter, accountable to the chapter leadership, who were accountable to the regional leadership. (Chavez Tr. 261).

Latin Kings members wore black and gold and developed ways to signal association with the organization. (Chavez Tr. 265; Salazar Tr. 947). Their symbols included a five-pointed crown, with each point representing a different value ("love, honor, obedience, sacrifice, and righteousness"); lions; a mascot called the Latin King Master; the letter "K," standing for King; and the letters "LK," standing for Latin King. (Chavez Tr. 207–08; Salazar Tr. 948). Slogans and hand signs also showed solidarity, such as "King Love," "Amor de Rey," and the hand sign in the shape of a crown. (Chavez Tr. 267, 470).

Strict rules governed the gang, and strict consequences for rule violations ensured compliance. The southeast region, for example, required paying dues, attending chapter meetings, holding security in the neighborhood, and retaliating against rival gangs. (Vargas Tr. 1295–1324). At chapter meetings, members discussed gang business, including violent conflicts with rival gang members, and whether other members of the Latin Kings were in bad standing. (Chavez Tr. 312). Minor rule violations were punished by beatings. (Chavez Tr. 625). More serious breaches led to

"Smash" or "Shoot" on sight orders ("S.O.S."). (Chavez Tr. 297–98). And for the worst transgressions, the regional officer or chapter Inca ordered a "Kill on Sight" (K.O.S.). (*Id.*)

The purpose of the Latin Kings was clear: "to expand, try to take more territory, and just try to be the dominant organization out [] in the United States" to "get more members, more money, and [] just dominate … everything." (Vargas Tr. 1222–23, 1255, 1258). One regional leader was particularly blunt. The Latin King gang existed for "violence," "extorting people," "extorting businesses," "robbing drugs," and "robbing drug dealers." (Salazar Tr. 942).

And Denava unambiguously affiliated with the Latin Kings. A defendant enters into an "agreement" if he was "aware of the essential nature and scope of the enterprise and intended to participate in it." *United States v. Useni*, 516 F.3d 634, 646 (7th Cir. 2008) (quoting *United States v. Swan,* 250 F.3d 495, 499 (7th Cir. 2001)); *see also id.* (explaining that an agreement "to facilitate the activities of those who are operating an enterprise" can be shown either through direct or circumstantial evidence). Between 2007 and 2016, Denava was a member of the Latin Kings's 99th Street Chapter. (Chavez Tr. 249-51). As a soldier, Denava was "out on the block" daily, sometimes with a gun. (Salazar Tr. 1032, 1034). He "would have people out there to hold the hood up, hold security, to make sure no rivals came through or, if they did come through, to take care of business." (*Id.*) Around 2008, Denava became the Enforcer of his chapter of the Latin Kings, then rose further in the ranks to become Cacique and Inca. (Chavez Tr. 475; Salazar Tr. 1031–38; Vargas Tr. 1390). At various times, Denava himself identified with the Latin Kings. He "shook up" (a greeting between Latin Kings) with Vargas and Chavez, who was a Regional Enforcer and oversaw the 99th Street Chapter, (Vargas Tr. 1410, 1413–14, 1479); displayed Latin Kings hand signs, (Exhibit 3205); wore the colors of the Latin Kings, (*id.*); and got Latin King tattoos,

specifically a five-point crown and the word "Ruthless," the name of the 99th Street Chapter, (Exhibit 2104; Conroy Tr. 98; Chavez Tr. 251–52).

### ii.     Pattern of Racketeering Activity

A pattern of racketeering activity involves two or more "related predicate acts" of "racketeering activity" committed within a ten-year period by some member or members of the conspiracy. *United States v. Farmer*, 38 F.4th 591, 602 (7th Cir. 2022). "Related predicate acts" have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 828 (7th Cir. 2016) (quoting *H.J. Inc.*, 492 U.S. at 237). "Racketeering activity" encompasses a broad range of activities, including witness tampering, "murder, attempted murder, arson, robbery, extortion, and drug trafficking." *Farmer*, 38 F.4th at 602; *see also* 18 U.S.C. § 1961(1). And the defendant need not have committed those acts; it suffices that "a particular defendant agreed that *a member* of the conspiracy would commit two predicate racketeering acts, not that the particular defendant committed or agreed to commit two predicate acts himself." *United States v. Benabe*, 654 F.3d 753, 776 (7th Cir. 2011) (citing *Salinas v. United States*, 522 U.S. 52, 65–66 (1997)).

The evidence at trial, drawn from several witnesses and exhibits, shows that Denava conspired as a member of the Latin Kings to commit at least two crimes of "racketeering activity," including attempted murder, solicitation of murder, extortion, and witness tampering and intimidation. Two examples stand out. In the first, Denava entered the territory of a different gang, the Ambrose gang, and personally shot at a member's house. (Chavez Tr. 534–36). The victims both testified that he approached on foot and fired, striking one in the leg. (Macias Tr. 3052–63;

Salazar Tr. 3070–73). A fellow Latin King told the jury that Denava confessed that he had "shot an Ambro on Commercial Avenue." (Gonzalez Tr. 2986–92).

In the second, Denava, in a minivan with other Latin King members, pulled up alongside Jerome Watson as he was walking home from the store. The occupants asked Watson whether he was a member of the Gangster Disciples, a Latin King rival. (Watson Tr. 2350–52). Watson disclaimed any gang membership. (*Id.* 2351). Denava—who was later identified by another Latin King member—was unconvinced and, so, jumped out of the minivan and opened fire on Watson, who was struck at least six times with bullets. (Gonzalez Tr. 2994; Watson Tr. 2354). Wounded, Watson ran into his home, kicked the front door closed behind him, and collapsed. Later, Denava bragged to other Latin King members that he had been the one to shoot Watson. (Gonzalez Tr. 2993–94).

Nor are these the only two examples. As the Enforcer of the 99th Street Chapter, Denava ordered Ricardo Denava beat for not giving dues and narcotics proceeds to his chapter. (Salazar Tr. 1038–44). To prevent a Latin King, Robert Schultz, who was then 16 years old, from cooperating with law enforcement following a shooting, Denava ordered another Latin King to kill Schultz. (Didwania Tr. 3247–55). Juan Juarez-Boyd, a former Latin King member in Denava's chapter, recalled that as a young recruit still in grade school, Denava ordered him to shoot members of the rival Spanish Vice Lords. (Juarez-Boyd Tr. 2645–48, 2655–59). If successful, Boyd would then "earn his crown," that is, be a true Latin King. (*Id.* 2659). Eager to please Denava, Boyd rode his bicycle to enemy gang territory, armed with a gun. (*Id.* 2657–58). There though, he started to get nervous; members of the Spanish Vice Lords recognized him, hopped off a porch, and threw up gang signs. (*Id.* 2658). Boyd quickly fled, as the enemy gang started firing at an accomplice.

(*Id.*) Upon learning that shots were fired during the mission, Denava "blessed" Boyd into the Latin Kings. (*Id.* 2660–61).

### B.    VICAR Assault (Count II)

Fourteen years after the passage of RICO, Congress added a new offense as part of the Comprehensive Crime Control Act of 1984—Violent Crimes in Aid of Racketeering Activity—to further prevent violence associated with organized crime. *Cf. Alvarado-Linares v. United States*, 44 F.4th 1334, 1342 (11th Cir. 2022); *United States v. Rogers*, 89 F.3d 1326, 1335 (7th Cir. 1996). The relevant provision states,

> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished.

18 U.S.C. § 1959(a). Under the law, the government must establish "(1) the existence of a RICO enterprise; (2) that the enterprise was engaged in racketeering activity; (3) that the defendant 'had a position in the enterprise;' (4) that the defendant committed one of the crimes specified in the VICAR statute," defined by state or federal law, and "(5) that the defendant's purpose was "to maintain or increase his position in the enterprise." *United States v. Keene*, 955 F.3d 391, 394 (4th Cir. 2020) (quoting *United States v. Zelaya*, 908 F.3d 920, 926–27 (4th Cir. 2018)). Here again, the evidence supports the conviction. As explained above, the government established that the Latin Kings was an enterprise engaged in racketeering activity and that Denava held a position in the gang. Only the latter two elements—that the defendant committed a recognized offense to further his position in the enterprise—require further explanation now.

Illinois law provides that a person commits aggravated battery when he knowingly "causes great bodily harm or permanent disability or permanent disfigurement" to an individual. 720 ILCS 5/12–3.05. "Knowingly" implies the aggressor was "consciously aware that his conduct [was] practically certain to cause great bodily harm." *People v. Willett*, 37 N.E.3d 469, 479 (Ill. App. Ct. 2015) (quoting *People v. Psichalinos*, 594 N.E.2d 1374, 1381 (Ill. App. Ct. 1992)). "Acts committed by one person in furtherance of a common plan are considered to be the acts of all parties to the agreement." *Huynh v. Bowen*, 374 F.3d 546, 549 (7th Cir. 2004).

Here, a reasonable jury could conclude that Denava committed aggravated battery by carrying out the order of Raul Cavillo, the Regional Enforcer, to retaliate against the Spanish Vice Lords for shooting at him. The mother of Cavillo's son, Alexandra Alcala, said that the Latin Kings found out "whoever it was that was shooting at [Cavillo] that one day," and they "crashed into" the shooter's car. (Alcala Tr. 2916–23). Chavez recalled hearing from Cavillo, himself, about the events that had precipitated the attack. (Chavez Tr. 541). A member of the Spanish Vice Lords, Jesus Ortega, shot at Cavillo while he was dropping his children off with Alcala (Chavez could see the bullet holes in the car). The next day, Chavez heard from Denava, who arrived with a "smashed in" car, what happened. Denava said that he rammed into the Spanish Vice Lord's car, disabling the vehicle and allowing other Latin Kings to drag Ortega out, where they proceeded to beat him to the point of brain damage. (Chavez Tr. 541–47). Another witness, Amanda Jimenez, placed Denava's white SUV at the scene. (Jimenez Tr. 2875–99).

Moreover, Denava committed the assault in furtherance of his standing in the Latin Kings. "The motive requirement of the offense at issue [] is met if the jury could properly infer that 'the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.'" *United*

*States v. DeSilva*, 505 F.3d 711, 715 (7th Cir. 2007) (quoting *United States v. Carson*, 455 F.3d 336, 369 (D.C. Cir. 2006)). Of course, admitting participation in an assault and the purpose of the assault—as happened here—demonstrates motive. *See United States v. Olson*, 450 F.3d 655, 673 (7th Cir. 2006). The assault occurred the day after Raul Cavillo ordered retaliation against the Spanish Vice Lords, and Denava admitted to another Latin King that he "used his SUV as a 'rammer'" to retaliate against the Spanish Vice Lords in response to Cavillo's order. (Chavez Tr. 544). Together, the witnesses provide sufficient evidence that Denava knowingly, as part of a preplanned attack, committed aggravated assault against Ortega.

## B.    **Motion for Mistrial**

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." *United States v. Foy*, 50 F.4th 616, 622 (7th Cir. 2022) (quoting Fed. R. Crim. P. 33(a)); *see also United States v. Hamdan*, 910 F.3d 351, 357 (7th Cir. 2018) ("[C]ourts have interpreted [Rule 33] to require a new trial 'in the interests of justice' in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial.") (quoting *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989)). A jury verdict is not overturned lightly, however. *See United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994). A motion for a new trial is granted only in "the most extreme cases," *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998), and "only if there is a reasonable possibility that the trial error had a prejudicial effect upon the jury's verdict," *United States v. Maclin*, 915 F.3d 440, 444 (7th Cir. 2019). This is not an extreme case.

### A.  **Severance**

"There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). A court grants a severance only when

10

"there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539. "[B]lame-shifting among codefendants, without more, does not mandate severance." *United States v. Plato*, 629 F.3d 646, 650 (7th Cir. 2010). And even if a risk of prejudice exists, a district court may tailor the relief in its sound discretion. *Zafiro*, 506 U.S. at 538–39. Measures short of severance, "such as limiting instructions, often will suffice." *Id.*

Denava contends that the defense of another defendant, Emanuel Mendez, was "mutually antagonistic" because Mendez said throughout trial that the Latin Kings were "a high organized and 'corrupt' criminal enterprise." (Dkt. 1785 at 6). "Put another way, Mendez's defense relied on conflating the concepts of enterprise and conspiracy, so that by conceding the Government's case against the Latin Kings enterprise and the charged conspiracy, his membership in a different enterprise made joining the charged conspiracy impossible." (*Id.* at 6–7). But this contention falls flat. Denava cannot defeat the presumption that codefendants should be tried together. *See Zafiro*, 506 at 537.

The defenses of Denava and Mendez were never "mutually antagonistic." Defenses are only "mutually antagonistic" when "the jury's acceptance of one defense precludes any possibility of acquittal for the other defendant." *United States v. Mietus*, 237 F.3d 866, 873 (7th Cir. 2001). Denava argued at trial that the government could not prove he agreed to commit racketeering activities in furtherance of gang activity (this Court just explained why the evidence was sufficient to support a conviction). (*See* Denava Closing Tr. 4174). Mendez took a different tact, arguing that he was a Spanish Vice Lord, not a Latin King, and therefore could not have acted on behalf of the Latin Kings. The theories differ *in kind*. Mendez claimed he was never part of a gang, and Denava says that assuming he was a Latin King, he never committed the necessary criminal acts for a

11

RICO conspiracy. Neither defense precludes the other. Accepting that Mendez was a Spanish Vice Lord still permits the jury to accept that Denava did not conspire to commit racketeering and did not participate in the charged assault.

Moreover, contrary to what Denava believes, Mendez's counsel did not act "as a second prosecutor."[2] (Dkt. 1785 at 7). After Mendez's counsel made some passing improper remarks during his opening statement, this Court carefully considered and denied Denava's motion for severance and mistrial. The reasons, which the Court explained in a written order, apply again here. (*See* Dkt. 1513). The Seventh Circuit has repeatedly found that a codefendant conceding the existence of a conspiracy but denying his membership does not require severance. *See United States v. Gironda*, 758 F.2d 1201, 1220 (7th Cir. 1985), abrogated on other grounds by *United States v. Durrive*, 902 F.2d 1221 (7th Cir. 1990) (citing *United States v. Petullo*, 709 F.2d 1178, 1181–82 (7th Cir. 1983)); *United States v. Ziperstein*, 601 F.2d 281, 285–86 (7th Cir. 1979); *United States v. Harris*, 542 F.2d 1283, 1297 (7th Cir. 1976). And the curative instruction, given to the jury after opening statements, mitigated any harm. (*See* Tr. 91).

### B. Evidence

#### i. FBI Agent

Denava asserts that the Court erred in prohibiting him from calling Agent Michael Peetz as a witness. (Dkt. 1785 at 13). He maintains that Agent Peetz would have testified that Francisco

---

[2] While some courts have held that when codefendant's counsel acts as a second prosecutor, severance is required, *United States v. Romanello*, 726 F.2d 173, 179 (5th Cir. 1984), the Seventh Circuit has cast doubt on this holding after *Zafiro v. United States*, 506 U.S. 534. *United States v. Mietus*, 237 F.3d 866, 874 (7th Cir. 2001). In a case where the codefendant's defense was similar to Mendez's defense—he argued that "even if there was a conspiracy, there was no evidence that Chrobak was involved," *id.* at 873—the Seventh Circuit rejected the idea that such a defense mandated severance. "There is no specific trial right," it elaborated, "not to have a co-defendant give damaging testimony." *Id.* at 874. Ultimately, this Court need not address the question whether *Romanello* survives after *Zafiro* because Mendez's counsel acted solely as a defense attorney for his client. Nothing more.

Gamez "was a paid Government agent when he ordered the beating of Juan Juarez-Boyd in retaliation for testifying against Dean Trevino." (Dkt. 1785 at 13).

This Court, however, already reviewed the evidence *in camera* and addressed this argument, concluding it lacked merit. That decision was not in error. A defendant's theory must be "supported by law and that [have] some foundation in the evidence." *United States v. Wiman*, 77 F.3d 981, 985 (7th Cir. 1996) (quoting *United States v. Herrera*, 54 F.3d 348, 354 (7th Cir. 1995)); *see also* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). District courts have discretion to prohibit defense theories that have no evidentiary support, *see United States v. Swanquist*, 161 F.3d 1064, 1075 (7th Cir. 1998) (asserting that defendants' jury instructions must reflect a theory supported by the evidence), and enjoy "special deference" to weigh the value of evidence against "the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* at 1074.

Here, the danger of confusing the issues or misleading the jury was high. Denava was attempting to offer a theory that lacked any foundation in evidence. Although Gamez had called Agent Peetz and provided the FBI with information about the Latin Kings, no evidence indicated he acted as a government agent when ordering the beating of Juarez Boyd. (Tr. 3851). Nothing linked Gamez being a confidential government informant with committing criminal activities on behalf of the government. What Denava attempted to construct through calling Agent Peetz was, at best, misleading. And Denava even conceded later that Gamez was "deactivated" before the attack on Juarez-Boyd. (Dkt. 1872 at 54). Therefore, there was no good-faith reason to call Agent Peetz as a witness—and no relevance. *See* Fed. R. Evid. 403.

### ii. Hearsay

Next, Denava asserts—in perfunctory form—that the government failed to identify co-conspirator statements in its *Santiago* proffer. (Dkt. 1785 at 14–15). The provided citation points to a specific part of the trial transcript where the government published Facebook messages sent from Denava's account. Again, this Court already explained why the statements were admissible: statements by a party opponent are "not hearsay," Fed. R. Evid. 801(d)(2)(A), and even if they were, they constituted statements against interest, Fed. R. Evid. 804(b)(3). (*See also* Tr. 234). This Court also offered to give a limiting instruction that the non-party opponent's statements were offered simply as context for Denava's statements. (Tr. 235). Regardless, "the case law is very clear that the [statements] can be admitted." (Tr. 178).

## C. Remaining Issues

Denava offers several last-ditch arguments. *First*, he argues cumulative error, that is, the cumulative effect of many errors deprived him of a fair trial. (Dkt. 1785 at 16). "Cumulative errors, while individually harmless, when taken together can prejudice a defendant as much as a single reversible error and violate a defendant's right to due process of law." *United States v. Edwards*, 34 F.4th 570, 588 (7th Cir. 2022) (quoting *United States v. Marchan*, 935 F.3d 540, 549 (7th Cir. 2019)). As established though, Denava "fails to establish a single error, let alone two." *Id.*

*Second*, he posits that this Court made a comment about other defendants pleading guilty in response to a juror question. (Dkt. 1785 at 16–17). But Denava cannot point to anywhere in the record where this happened, nor can he point to a properly made objection, so it is waived. Even without waiver, this Court conveyed true and accurate statements, which did not impact Denava's fundamental rights. Indeed, numerous witnesses testified to pleading guilty, a fact that Denava raised during cross-examination and in closing. (*See* Tr. 4145–54).

14

*Third*, he asserts that Juror No. 6's question using the term "convicted" demonstrated prejudice against him. This Court has already addressed the issue. The juror likely confused the terminology, an understandable mistake for lay people unfamiliar with the deep meaning that legal words have and the careful consideration exercised by lawyers when using them (at least, in an ideal world). The Court explained to the jury that that "charges" come before the case and that the government must meet its burden to prove a defendant committed a crime beyond reasonable doubt for a jury to "convict" a suspect. (Tr. 92).

*Finally*, he alleges that this Court admitted evidence of violent incidents that Denava was not involved in. "This evidence was irrelevant and [the acts'] brutal nature prejudiced him in the eyes of the jury, denying him a fair trial." (Dkt. 1785 at 17). In a telling sign, Denava does not actually identify the evidence or the violent incidents. Nor did he ever object to this apparently improper evidence at trial. This Court will not speculate exactly what Denava means. Doing so would not only encourage poor briefing but, more importantly, might improperly suggest the claim has merit.

## **CONCLUSION**

For these reasons, Denava's motion for acquittal or, in the alternative, a new trial is denied. (Dkt. 1785).

Virginia M. Kendall
United States District Judge

Date: July 25, 2023

15